CLERK'S OFFICE U.S. DIST. COURT
AT ABINGDON, VA
FILED

APR 0 8 2008

JOHN F. CORCORAN, CLERK
BY: _____
    DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **SALLY WILLIAMS,** | ) | |
| Plaintiff, | ) | Civil Action No. 2:07cv00025 |
| | ) | |
| **v.** | ) | **MEMORANDUM OPINION** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | BY: GLEN M. WILLIAMS |
| **Commissioner of Social Security,** | ) | SENIOR UNITED STATES DISTRICT JUDGE |
| Defendant. | ) | |

In this social security case, the court affirms the final decision of the Commissioner denying benefits.

## I. Background and Standard of Review

The plaintiff, Sally Williams, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying Williams's claims for disability insurance benefits, ("DIB"), and supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 423 and § 1381 *et seq.* (West 2003 & Supp. 2007). Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3).

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a

-1-

reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Williams filed her applications for SSI and DIB on or about October 20, 2004, alleging disability as of January 1, 2002, based on an anxiety disorder, arthritis of the hands, back and knees, chronic obstructive pulmonary disease, ("COPD"), hypertension and alcohol dependence. (Record, ("R."), at 13, 15, 55-60, 295-97.) The claims were denied initially and on reconsideration. (R. at 20-27, 30-32, 298-308.) Williams then requested a hearing before an administrative law judge, ("ALJ"). (R. at 33.) The ALJ held a hearing on March 22, 2006, at which Williams was represented by counsel. (R. at 327-51.)

By decision dated June 27, 2006, the ALJ denied Williams's claims. (R. at 13-19.) The ALJ found that Williams met the disability insured status requirements of the Act for DIB purposes through December 31, 2006. (R. at 15.) The ALJ found that Williams had not engaged in substantial gainful activity at any time relevant to the decision. (R. at 15.) In addition, the ALJ found that Williams suffered from anxiety disorder and arthritis, which he considered severe impairments pursuant to 20 C.F.R. §§ 404.1520(c), 416.920(c). (R. at 15.) However, the ALJ determined that Williams did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P,

-2-

Appendix 1. (R. at 16.) After a review of the record, the ALJ found that Williams had the residual functional capacity to perform light work.[1] (R. at 17.) The ALJ determined that Williams possessed the ability to sit for eight hours with normal breaks, stand for four hours and walk for two hours with normal breaks. (R. at 17.) Furthermore, the ALJ found that Williams was able to lift items weighing up to 10 pounds frequently and items weighing up to 50 pounds occasionally, and that she had the ability to occasionally stoop and crawl. (R. at 17.) The ALJ also found that Williams could understand and perform simple job instructions with one and two step tasks, and that she could maintain concentration and attention for extended periods of time. (R. at 17.) The ALJ found that Williams was capable of performing her past relevant work as a sewing machine operator, sales clerk and cashier, as those occupations did not require performance of activities precluded by her residual functional capacity. (R. at 19.) Thus, the ALJ concluded that Williams was not under a disability as defined under the Act, and that she was not entitled to benefits. (R. at 19.) *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (2007).

After the ALJ issued his decision, Williams pursued her administrative appeals, (R. at 10), but the Appeals Council denied her request for review. (R. at 6-9.) Williams then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. §§ 404.981, 416.1481 (2007). The case is before this court on Williams's motion for summary judgment filed November 20, 2007, and on the Commissioner's motion for summary

---

[1]Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can do light work, she can also do sedentary work. *See* 20 C.F.R. §§ 404.1567(b), 416.967(b) (2007).

Case 2:07-cv-00025-GMW-PMS   Document 20   Filed 04/08/08   Page 3 of 40   Pageid#: 66

judgment filed January 11, 2008.

## II. Facts

Williams was born in 1951, (R. at 49, 55, 330), which classifies her as "person of advanced age" under 20 C.F.R. §§ 404.1563(e), 416.963(e) (2007). Williams has a high school education and past work experience as a sewing machine operator, a store clerk and a cashier. (R. at 95, 330.)

At a hearing before the ALJ on March 22, 2006, Williams testified that her last employment was in 2003 as a store clerk, where she worked for approximately two to three months. (R. at 330.) She also testified that she had previously worked at this same job, and that her two periods of employment as a store clerk totaled "over a year." (R. at 331.) Williams indicated that she also had past work experience as a store clerk at other grocery stores and that she was previously employed as a cake decorator. (R. at 332-33.) Williams testified that, as a store clerk, she was required to lift objects weighing, at most, up to 20 to 25 pounds. (R. at 334.)

Williams explained that she could no longer perform these jobs because of pain, which prohibited her from standing for long periods and lifting and carrying objects. (R. at 333.) Williams further testified that she experienced back pain, which caused "bad" pain in the center of the back and caused her muscles to tighten up, making it difficult to stand for extended periods. (R. at 334.) She stated that her back sometimes would catch when she performed tasks such as washing dishes, which often forced her to sit down and elevate her feet due to the pain associated with

-4-

standing.  (R. at 335.)

Williams also testified as to her leg and hip pain, and indicated that the pain impacted her ability to walk and stand.  (R. at 335.)  She explained that minimal walking caused very bad hip pain that would worsen overnight.  (R. at 335.)  Williams testified that she experienced sleep difficulties that caused her to wake several times throughout the night.  (R. at 335.)  She further testified that if she slept on either of her sides, she was awakened by hip pain.  (R. at 335.)  In addition, Williams noted that she suffered from neck pain, back pain and anxiety related problems that affected her ability to sleep.  (R. at 335-36.)  Williams described problems that she had experienced with her hands, particularly her thumbs, and noted that her fingers "started kind of locking up at times[,]" when she attempted certain tasks such as taking a cap off of a bottle.  (R. at 336.)  Moreover, she stated that she occasionally dropped things, especially if the item was a large object.  (R. at 337.)  Williams testified that she experienced difficulties with writing due to her hand problems.  (R. at 337.)

Williams commented that she suffered from dizzy spells when sitting or standing, particularly when she first awoke and, also, intermittently throughout a typical day.  (R. at 338.)  Williams also testified that she had a cyst on the bottom of her right foot, as well as "problems with [her] toes."  (R. at 338.)  She indicated that her feet and toes often "cramp[ed] up," which she described as "very painful."  (R. at 338.)  Williams explained that her doctor stated that he could treat the condition with cortisone, but that he could not perform any surgery unless Williams obtained medical insurance.  (R. at 338.)  Williams testified that, due to the problems she described, she is forced to frequently lie down and rest throughout the day to alleviate

Case 2:07-cv-00025-GMW-PMS   Document 20   Filed 04/08/08   Page 5 of 40   Pageid#: 68

her back and hip pain. (R. at 339.) She explained that sitting in a chair did not relieve her pain; instead, she stated that she had to elevate her feet to relieve the pressure from her back. (R. at 339.) Williams also noted that her condition forced her to lie down every half hour to an hour. (R. at 339.)

Williams acknowledged that she suffered from anxiety and panic attacks. (R. at 339.) She testified that her anxiety made her feel like something terrible was about to happen or that something was "just unbearably wrong." (R. at 340.) Additionally, she stated that her condition caused heart palpitations, breathing problems and a sense of panic. (R. at 340.) Williams testified that she normally experienced one "bad" panic attack per month, but that she had constant feelings of anxiety and panic. (R. at 340.) She explained that the only thing she was able to do when an attack occurred was to go outside into an open space. (R. at 340.)

Williams testified that, at the time of the hearing, she took medication to treat her ailments, but that, despite the medication, her anxiety had increased and her pain was constant. (R. at 341.) She stated that she experienced side effects such as dizziness due to her medication. (R. at 341.) Williams acknowledged that she had a history of alcohol abuse, and that she attended a substance abuse program and was treated by a psychiatrist and case manager, who helped her deal with her alcohol problem. (R. at 341-42.)

Williams also testified as to her daily activities. (R. at 343.) She explained that she was not able to do much throughout the day, other than sit with her feet elevated. (R. at 343.) She stated that when she attempted to do certain activities, she was

-6-

forced to stop and rest. (R. at 343.) Williams further explained that, if she did too much throughout the day, she was in "agony" the next day. (R. at 343.) Moreover, she testified that she did not engage in social activities, other than going with her sister to the grocery store, attending a woman's therapy group and attending her medical appointments. (R. at 343.)

The ALJ questioned Williams as to work that she performed in 2004, in which she received $50.00 per month for housework. (R. at 343-44.) She testified that she ceased this work about one year prior to the date of the hearing. (R. at 344.) During this questioning, Williams also acknowledged that she performed housework for her sister up until approximately six months prior to the date of the hearing. (R. at 344.)

Gerald K. Wells, a vocational expert, also testified at Williams's hearing. (R. at 345-50.) Wells noted that Williams was considered a person closely approaching advanced age and that she had a high school education. (R. at 345.) He identified her past relevant work as a store clerk as light to medium,[2] unskilled work and her employment as a cashier and cake decorator as light, unskilled work. (R. at 346.) Williams's employment in furniture sales was said to be light, semiskilled work, as was her past work as a sewing machine operator. (R. at 346.) Wells also noted that Williams had performed work in a factory setting as a sander, which was light, unskilled work. (R. at 346.) Lastly, he referenced Williams's past work as a

---

[2]Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of items weighing up to 25 pounds. If someone can perform medium work, she also can perform light and sedentary work. *See* 20 C.F.R. §§ 404.1567(c), 416.967(c) (2007).

-7-

warehouse worker, which he identified as heavy,[3] unskilled work. (R. at 346.)

Wells was asked to assume a hypothetical individual of the same age, education and work history as Williams, with the limitations as set forth in Exhibit 5F,[4] as well as the limitations set forth in the state agency assessment. (R. at 346-47.) Wells testified that such an individual would be limited to a wide range of sedentary[5] work and a limited range of light work. (R. at 348.) However, he explained that the work would need to be relatively simple and routine, with moderate restrictions in all areas. (R. at 348.) Despite these limitations, Wells opined that the individual would be able to perform some of her past relevant work, including that of a sewing machine operator, a sales/retail worker in the furniture business and as a cashier. (R. at 348.) He further explained that the individual's remaining past relevant work, which was in the light exertion level, would not be able to be performed by the individual because she would be required to walk more than allowed for in the hypothetical. (R. at 348.) Wells noted that his testimony did not conflict with the Dictionary of Occupational Titles. (R. at 348.)

Williams's counsel also examined Wells at the hearing. (R. at 348.)

---

[3]Heavy work involves lifting items weighing up to 100 pounds at a time with frequent lifting or carry of items weighing up to 50 pounds. If an individual can perform heavy work, she also can perform medium, light and sedentary work. *See* 20 C.F.R. §§ 404.1567(d), 416.967(d) (2007).

[4] Exhibit 5F is a consultative examination conducted by Dr. Mark B. Stowe, M.D., on January 6, 2005. (R. at 177-85.)

[5]Sedentary work involves lifting items weighing up to 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers and small tools. *See* C.F.R. §§ 404.1567(a), 416.967(a) (2007).

-8-

Williams's counsel asked Wells to consider the limitations as set forth in Exhibit 15F.[6] (R. at 349.) Wells opined that, considering those restrictions, the hypothetical individual would be restricted to part-time work due to the fact that the individual could only work five hours in a typical eight-hour workday. (R. at 349.) Additionally, Williams's counsel asked Wells whether, based upon Williams's testimony, if there would be any jobs that she could perform. (R. at 349.) Wells opined that, an individual with the limitations as described by Williams, would not be able to function in a work setting because Williams indicated that she had to lie down every half hour. (R. at 350.) Further, Wells testified that Williams's thoughts of impending disaster and constant anxiety also would preclude any sustained work activity. (R. at 350.)

In rendering his decision, the ALJ reviewed records from Patrick County Memorial Hospital; Patrick County Family Practice; Tri-Area Health Clinic; Free Clinic of Franklin County; Dr. Mark B. Stowe, M.D.; R.J. Milan Jr., Ph.D., a state agency psychologist; Dr. Babar N. Hassam, M.D.; Piedmont Community Services; E. Hugh Tenison, Ph.D., a state agency psychologist; Dr. Richard M. Surrusco, M.D., a state agency physician; Dr. Donald R. Williams, M.D., a state agency physician; and Dr. Tiffany A. Taylor, M.D.

The record shows that Williams presented to Patrick County Memorial Hospital

---

[6] Exhibit 15F contains a letter from Williams's counsel to the ALJ referencing additional medical records from the Free Clinic of Franklin County. (R. at 272-92.) At the hearing, Williams's counsel specifically referenced the Medical Assessment of Ability To Do Work-Related Activities (Physical) form, which was completed by Dr. Tiffany A. Taylor, M.D., on February 16, 2006. (R. at 273-74.)

on September 14, 2001, with chief complaints of chest congestion and a cough. (R. at 145-46.) Williams was diagnosed with bronchitis and prescribed a Z-Pak. (R. at 146.)

On February 21, 2003, Williams sought treatment at Patrick County Family Practice. (R. 147-49.) Williams presented with complaints of hot flashes, anxiety, nausea, vomiting, insomnia, congestion, cough and fever. (R. at 149.) In addition, Williams indicated that she felt extremely anxious and that she frequently experienced episodes of palpitations. (R. at 149.) She also reported insomnia, diminished appetite, constant anxiousness and stress. (R. at 149.) Williams's medical history was remarkable for COPD and revealed that she had a history of hypertension. (R. at 149.) Furthermore, it was noted that Williams's family history was remarkable for anxiety and depression, including her mother's suicide at age 53. (R. at 149.) A history of tobacco and alcohol use also was reported. (R. at 149.) Upon examination, Williams was observed to be anxious and quite animated. (R. at 148.) Williams also displayed considerable insight and an ability to logically answer questions. (R. at 148.) The assessment revealed depression with co-morbid anxiety and frequent panic attacks. (R. at 148.) Williams was determined to be under medicated, but was not thought to be bipolar. (R. at 148.) Williams's insomnia was attributed to her depression. (R. at 148.) Williams's Zoloft prescription was increased to 50 milligrams one time per day, and her amitriptyline was increased to 25 milligrams every night at bedtime. (R. at 148.) Williams was advised to decrease her alcohol intake. (R. at 148.) The assessment also noted that Williams's COPD had likely been exacerbated by her tobacco use, and that Williams indicated she could quit smoking. (R. at 148.) Williams was prescribed amoxicillin 875 milligrams to

-10-

treat her bronchitis. (R. at 148.) Her vasomotor symptoms were reported to be "fairly disabling," thus, a trial of Estradiol one milligram, one time per day was prescribed. (R. at 148.)

Williams returned to Patrick County Family Practice on March 21, 2003, for a follow-up appointment regarding her persistent symptoms of bronchitis. (R. at 148.) Williams was coughing up thick, yellow sputum and was running a low grade fever. (R. at 148.) Williams reported that she had reduced her tobacco and alcohol use. (R. at 148.) Although Williams still experienced some vasomotor symptoms, they were less severe, and she acknowledged that the Estradiol prescription had been helpful. (R. at 148.) Upon examination, Williams did not appear to be dyspneic and her lungs were clear. (R. at 147.) However, mild tenderness was reported over the frontal and maxillary sinuses. (R. at 147.) Williams was prescribed Nasacort and Biaxin and was continued on Estradiol. (R. at 147.)

Williams sought treatment at Tri-Area Health Clinic from November 27, 1999, to September 4, 2003.[7] (R. at 150-62.) On November 27, 1999, a complete blood count and thyroid-stimulating hormone blood test were administered; however, the results of these tests could not be identified in the record. (R. at 156.) Williams returned to the Tri-Area Health Clinic on January 30, 2002, and complained of hypertension, hot flashes, congestion and eczema. (R. at 156.) Williams was prescribed Biaxin, Rondec DM, Lotrisone cream and Prinzide, and was discontinued from hydrochlorothiazide. (R. at 156.) Williams presented again on June 19, 2002, and complained of a cough, nasal drainage and headaches. (R. at 155.) Williams was

---

[7]The medical records during this time period are largely illegible.

directed to discontinue the Prinzide and was prescribed, among other things, Biaxin, Phenergan with codeine and Azmacort. (R. at 155.) Williams presented on July 3, 2002, and the medical records appear to indicate that she was coughing less. (R. at 155.) While it is difficult to decipher the remaining notations from this visit, it appears that Williams was prescribed Augmentin. (R. at 155.)

Williams returned to the Tri-Area Health Clinic on July 13, 2002, with complaints of back pain. (R. at 154.) As a result, Williams was prescribed Skelaxin. (R. at 154.) Williams presented on July 25, 2002, and complained of increased anxiety, poor sleep and panic. (R. at 154.) She indicated that she had suffered from these types of symptoms for more than 10 years, and also indicated that she had taken medications such a Xanax and Ativan in the past. (R. 154.) The medical records referenced her mother's suicide and revealed that Williams stated that she would consider suicide if her condition did not improve. (R. at 154.) Williams also reported that she consumed about a six pack of beer per day. (R. at 154.) Williams was prescribed Paxil and Vistaril, and was advised to follow up regarding her blood pressure. (R. at 154.) On July 25, 2002, Williams requested samples of her blood pressure medication, Azmacort, Combivent and Zoloft. (R. at 153.) Williams again presented on January 11, 2003, and her chief complaint was chest congestion. (R. at 153.) Her pharynx was observed to be red, but the rest of the examination was not remarkable. (R. at 153.) Williams's hypertension was reported as stable, and she was diagnosed with pharyngitis. (R. at 153.) She was prescribed amoxicillin and Rondec DM, and her other medications such as Lotensin, Azmacort, Combivent and Zoloft were renewed. (R. at 153.) Williams was advised to follow up in three to six months regarding her blood pressure. (R. at 153.)

Case 2:07-cv-00025-GMW-PMS   Document 20   Filed 04/08/08   Page 12 of 40   Pageid#: 75

Williams presented on May 30, 2003, and complained of a cough, congestion and left side back pain. (R. at 152.) She indicated that she had suffered from lumbarsacral pain for more than one month and that her back problems resulted in immobilizing pain. (R. at 152.) Williams attributed her back pain to a horse riding accident that occurred when she was 10 years old, and noted that she had experienced periodic back pain ever since. (R. at 152.) Pain was observed in the left lumbar region on palpation, and the lumbarsacral spine was tender to palpation. (R. at 152.) Williams was prescribed Naprosyn and Elavil, and her Lotensin dosage was increased. (R. at 152.) Williams presented again with complaints of a cough and sinus congestion.[8] (R. at 151.) She reported feelings of nausea and postnasal drip, but indicated that her sleep issues had improved. (R. at 151.) Upon examination, tenderness was noted in the maxillary facial area and her pharnyx was observed to be red. (R. at 151.) Williams was diagnosed with sinusitis and was given amoxicillin. (R. at 151.) She was advised to return for a blood pressure check, lipid panel and thyroid-stimulating hormone blood test. (R. at 151.)

Williams presented to the Tri-Area Health Clinic on August 29, 2003, and again complained of a cough and chest congestion. (R. at 150.) Williams reported increased anxiety and admitted to smoking and drinking alcohol too much. (R. at 150.) Tenderness was noted at the frontal maxillary facial area. (R. at 150.) Williams indicated that she could not afford to continue taking Lotensin to treat her blood pressure, thus, she was given Uniretic. (R. at 150.) Williams also was prescribed Atarax to treat her anxiety and insomnia and amoxicillin to treat her sinusitis. (R. at 150.) In addition, Williams was advised to stop smoking and to seek

_____

[8]The date of the office visit is not clear from the record.

-13-

counseling for her alcohol abuse. (R. at 150.)

Williams was treated at the Free Clinic of Franklin County, ("FCFC"), from February 13, 2004, to October 20, 2005. (R. at 163-76.) On February 23, 2004, Williams presented with chief complaints of arthritis, allergies and hypertension. (R. at 171.) Specifically, she complained of arthritis in her hands, back, legs and hips. (R. at 171.) Williams indicated that she had experienced problems with arthritis for an extended time, but explained that the problems had worsened. (R. at 171.) Upon examination, tenderness was noted along the spine and in the hands. (R. at 171.) Williams's hypertension was reported as uncontrolled, thus, she was restarted on Lotensin. (R. at 171.) Williams also was prescribed Relafen to treat her arthritis. (R. at 171.) Williams again sought treatment at FCFC on April 5, 2004, and explained that Relafen had caused diarrhea. (R. at 170.) She noted that the diarrhea subsided after running out of the medication; therefore, she requested another medication to treat her arthritis. (R. at 170.) As a result, Williams was prescribed Arthrotec for arthritis and was continued on her Lotensin. (R. at 170.) Williams presented on April 26, 2004, and complained of arthritis pain, sinus problems and also claimed that the Arthrotec caused diarrhea and dizziness. (R. at 168-69.) Upon examination, Williams's lungs were reported as clear, she had a regular cardiac rhythm and her hands did not show any significant deformities. (R. at 168.) The assessment revealed arthritis, diarrhea, which was secondary to her medications, and an upper respiratory infection. (R. at 168.) She was prescribed Profen Forte, Prevacid and Naprosyn, and was continued on Effexor and Lotensin. (R. at 168.)

Williams presented to the FCFC again on May 24, 2004, for a follow-up due

-14-

to continued arthritic pain, particularly in her back. (R. at 166-67.) Once again, she explained that her medications caused diarrhea. (R. at 166-67.) Williams reported that she had not had a normal bowel movement in two to three weeks and that she had lost approximately 20 pounds over the past two months. (R. at 166.) Upon examination, no tenderness was observed in the lumbar, thoracic or cervical spine. (R. at 166.) However, minimal paraspinal muscle tenderness was noted. (R. at 166.) A rectal examination showed some minor appearing internal hemorrhoids. (R. at 166.) The assessment noted diarrhea with an unclear etiology. (R. at 166.) In addition, the medical records stated "[d]ifferential diagnoses is quite lengthy, including ulcerative colitis, Crohn's, versus irritable bowel syndrome." (R. at 166.) A barium enema was ordered and Williams was instructed to follow up as needed. (R. at 166.) The barium enema revealed no findings to suggest a cause for Williams's symptoms. (R. at 176.) Williams also presented on July 12, 2004, and complained of a sinus infection and arthritis. (R. at 164-65.) Mild frontal sinus tenderness was observed, with more significant maxillary sinus tenderness. (R. at 164.) Williams was assessed with acute sinusitis and arthritis at multiple sites. (R. at 164.) She was prescribed Bactrim DS, Omnicef and Vioxx. (R. at 164.) Williams was seen again on August 24, 2004, regarding renewal of her blood pressure medication, eczema and sinus drainage. (R. at 163.) The medical records show that she was to restart her blood pressure medication and follow up in three months, and she was given samples of Biaxin and Ultravate. (R. at 163.)

On November 1, 2004, Williams was treated at the FCFC by Dr. Robert G. Day, M.D. (R. at 284-85.) Williams complained of worsened arthritis, especially after her Vioxx was discontinued. (R. at 284.) Williams also noted that Naprosyn

-15-

upset her stomach. (R. at 284.) She reported nasal congestion and a cough, which she attributed to her chronic bronchitis. (R. at 284.) Williams was prescribed Bextra, Flonase and doxycycline. (R. at 284.) On November 18, 2004, Williams again presented to FCFC and was treated by Dr. Tiffany A. Taylor, M.D., as a follow-up regarding her arthritis. (R. at 282-83.) Williams indicated that she was out of her medications, and the medical records show that the Bextra that had been previously prescribed was on order. (R. at 282.) Williams complained of continued discomfort in her back, hands, feet and hips. (R. at 282.) She also reported continued bowel problems and complained of constipation. (R. at 282.) An otherwise normal examination was reported. (R. at 282.) Williams was instructed to try Feldene to treat her arthritis until the Bextra arrived. (R. at 282.) Dr. Taylor also noted the possibility of irritable bowel syndrome and prescribed Zelnorm. (R. at 282.) In addition, Dr. Taylor suggested a thyroid test. (R. at 282.)

Williams presented to FCFC on May 5, 2005, and saw Dr. Taylor. (R. at 280-81.) Williams complained of whole body discomfort and daily pain due to arthritis, mainly in her hands, feet and back. (R. at 280.) She once again complained of bowel problems and reported that certain over the counter medications and the prescribed Zelnorm did not help her problems. (R. at 280.) Upon examination, tenderness was observed in the right lower quadrant of the abdomen. (R. at 280.) Additionally, minimal arthritic changes were noted in the distal interphalangeal, ("DIP"), and proximal interphalangeal, ("PIP"), joints. (R. at 280.) Dr. Taylor also noted minimal synovial thickening. (R. at 280.) Dr. Taylor reported that Williams's hypertension was controlled and prescribed Feldene to treat Williams's arthritis. (R. at 280.) On August 11, 2005, Williams presented for a follow-up appointment with Dr. Taylor

-16-

and indicated that she needed her medications refilled, including Vistaril, Effexor and trazadone. (R. at 279.) Dr. Taylor's assessment revealed possible fibromyalgia, as well as arthritis and a plantar lesion. (R. at 279.)

On September 12, 2005, Williams presented to Dr. Jack H. Bumgardner, Jr., M.D., at the FCFC. (R. at 277-78.) Williams complained of a sinus infection with headaches and soreness around her sinuses, as well as constipation, occasional dizziness, arthritis, edema on the legs and feet and a sore right thumb. (R. at 277-78.) Upon examination, Dr. Bumgardner observed slight inflammation of the sinuses with minimal congestion, mild tenderness and decreased range of motion of the right thumb, a nodular fibroma in the arch of the right foot and tenderness between the second and third toes, consistent with Morton's neuroma on the right foot. (R. at 277.) Dr. Bumgardner's assessment was sinusitis, constipation, minimal dizziness, right thumb discomfort and a fibroma on the plantar of the right foot, with bilateral Morton's neuroma. (R. at 277.) Williams was prescribed amoxicillin and Sudafed, and also was advised to increase her fiber, stool softeners and fluid content. (R. at 277.) Williams also presented on October 20, 2005, and was treated by Dr. Taylor. (R. at 275-76.) This visit was a follow-up on dental abscesses. (R. at 275.) Williams indicated that she needed refills of her Vistaril and trazadone. (R. at 275.) Dr. Taylor noted that Williams's hypertension was not controlled; thus, she increased Williams's Lotensin with hydrochlorothiazide. (R. at 275.) Williams also was prescribed Vistaril and an allergy medication. (R. at 275.)

Dr. Mark B. Stowe, M.D., completed a consultative examination on January 6, 2005. (R. at 177-85.) As a part of this examination, Dr. Stowe apparently

-17-

reviewed multiple x-rays, which included x-rays of Williams's right hand, the lumbar spine and the chest. (R. at 182-84.) Two views of the right hand demonstrated degenerative changes at the first carpometacarpal joint, with no evidence of fracture or dislocation. (R. at 182.) The x-rays of the lumbar spine showed five nonrib-bearing lumbar-type vertebra. (R. at 183.) The surrounding soft tissues were unremarkable and there was minimal scoliotic change. (R. at 183.) Degenerative facet disease was present at L4-5 and L5-S1, but there was no evidence of spondylolysis or spondylolisthesis. (R. at 183.) Two x-ray views of the chest revealed clear lungs, a normal heart size and configuration and no evidence of pleural fluid or pneumothorax. (R. at 184.) In addition, no acute abnormality of the bone was evident. (R. at 184.) The x-rays were negative for evidence of acute cardiopulmonary disease. (R. at 184.)

Upon examination, Dr. Stowe noted that Williams was alert and oriented, in no distress, pleasant, cooperative and nontoxic appearing. (R. at 178.) He also noted that Williams had a good memory with a normal affect. (R. at 178.) Dr. Stowe reported diminished breathing bilaterally. (R. at 178.) Furthermore, he found Williams's size and shape to be normal, and that her gait and station had normal gross and fine manipulation, especially with regard to dressing and undressing, climbing onto the examination table, grasping and shaking hands, picking up coins and grip and pinch strength. (R. at 178.) An examination of her joints showed no effusions, episodes of infection, particular swelling or heat. (R. at 178.) Mild tenderness was reported over the metacarpophalangeal and PIP joints of both hands. (R. at 178.) Dr. Stowe observed no redness or thickening of the joints. (R. at 178.) He also reported a normal range of motion in all areas. (R. at 180-81.) A spinal examination revealed

-18-

no kyphosis or scoliosis and the straight leg test was negative. (R. at 178.) Williams was diagnosed with osteoarthritis, tobacco abuse, hypertension and depression. (R. at 179.)

Dr. Stowe determined that Williams did not suffer from debilitating arthritis and noted that she would benefit from seeing a specialist to finely tune her treatment regimen. (R. at 179.) However, he recognized that Williams received treatment from a free clinic and concluded that she likely did not have the funds to see a specialist. (R. at 179.) He further reported that Williams displayed good cooperation and effort. (R. at 179.) Dr. Stowe found that Williams was capable of sitting for eight hours with normal breaks, standing for four hours and walking for two hours with normal breaks. (R. at 179.) Dr. Stowe also found that Williams did not require the use of any assistive devices and that she could lift and carry items weighing up to 10 pounds frequently and items weighing up to 50 pounds occasionally. (R. at 179.) He determined that she was not limited in her ability to bend, as he found that she could bend frequently. (R. at 179.) However, he found that she could only occasionally stoop and crouch. (R. at 179.) Dr. Stowe did not find any manipulative limitations on Williams's ability to reach, handle, feel, grasp or finger, as he determined that she could complete the activities frequently. (R. at 179.) Lastly, he noted no visual, communicative, workplace or environmental limitations. (R. at 179.)

On January 13, 2005, R.J. Milan Jr., Ph.D., a state agency psychologist, completed a Mental Residual Functional Capacity Assessment, ("MRFC"). (R. at 186-88.) Milan found that Williams was not significantly limited in certain understanding and memory areas, including the ability to remember locations and

work-like procedures or to understand and remember very short and simple instructions. (R. at 186.) However, he did determine that Williams was moderately limited in the ability to understand and remember detailed instructions. (R. at 186.) Additionally, as to Williams's sustained concentration and persistence ability, Milan found that Williams was not significantly limited in the following areas: the ability to carry out very short and simple instructions; the ability to maintain attention and concentration for extended periods; the ability to sustain an ordinary routine without supervision; the ability to make simple work-related decisions; and the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (R. at 186-87.) However, Milan found Williams to be moderately limited in her ability to carry out detailed instructions, the ability to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances and in the ability to work in coordination with, or proximity to, others without being distracted by them. (R. at 186.) Milan determined that Williams was not significantly limited in several areas of social interaction, including the ability to interact appropriately with the general public; the ability to accept instructions and respond appropriately to criticism from supervisors; the ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and the ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness. (R. at 187.) Milan found no evidence of a limitation in Williams's ability to ask simple questions or request assistance. (R. at 187.) As for Williams's adaptation ability, Milan found that Williams was not significantly limited in her ability to respond appropriately to changes in the work setting; the ability to be aware of normal hazards and take

appropriate precautions; the ability to travel in unfamiliar places or use public transportation; or the ability to set realistic goals or make plans independently of others. (R. at 187.)

Milan noted that the medical evidence established that Williams suffered from medically determinable impairments of panic disorder with agoraphobia and alcohol dependence. (R. at 188.) He also noted that Williams had never been hospitalized due to her mental impairments, and that it had been reported that she was stable and well-functioning, with no significant mental status abnormalities. (R. at 188.) In addition, he pointed out that Williams admitted to being able to perform daily activities independently. (R. at 188.) Milan determined that Williams's statements were partially credible. (R. at 188.) Milan concluded that Williams's limitations did not prevent her from meeting the basic mental demands of competitive work on a sustained basis. (R. at 188.)

On January 13, 2005, Milan also completed a Psychiatric Review Technique form, ("PRTF"). Milan again noted that Williams suffered from an anxiety-related panic disorder with agoraphobia and a substance abuse disorder. (R. at 189, 194, 197.) In addition, he determined that Williams was mildly limited in her activities of daily living and maintaining social functioning. (R. at 199.) Milan found that Williams was moderately limited in maintaining concentration, persistence or pace. (R. at 199.) Lastly, he determined that Williams had experienced no episodes of decompensation. (R. at 199.)

Dr. Babar N. Hassan, M.D., performed a pulmonary function report on January

27, 2005. (R. at 203-09.) Dr. Hassan reported that Williams had a mild obstructive impairment with small airway disease. (R. at 203.)

Williams sought treatment at Piedmont Community Services, ("PCS"), from February 19, 2004, to May 3, 2005. (R. at 210-18.) On February 19, 2004, Williams presented to PCS with chief complaints of anxiety and alcoholism. (R. at 218.) Williams indicated that her drinking problem began at age 16 and that she had been in and out of alcohol treatment throughout the years. (R. at 218.) Williams claimed that she had been sober since September 2003, the date of her last treatment. (R. at 218.) She noted that the Effexor and Elavil prescribed during that treatment had been helpful, but that she ran out of Effexor about one month prior to this particular visit. (R. at 218.) Williams reported panic attacks, fear of dying, shortness of breath, palpitations and paranoia. (R. at 218.) She also reported anxiety attacks, hot flashes and anticipation of something bad happening. (R. at 218.) Williams indicated that her appetite was erratic and that she suffered from sleeping problems. (R. at 218.) Williams denied any suicidal ideations or attempts. (R. at 218.) Williams also reported that she had been hospitalized in Marion, Virginia, and Galax, Virginia, due to these problems. (R. at 218.) Dr. M. Rizwan Ali, M.D., diagnosed Williams with alcohol dependence and panic disorder without agoraphobia and ruled out histrionic and narcissistic personality traits. (R. at 217.) Dr. Rizwan identified Williams's general medical conditions as hypertension, allergies and arthritis. (R. at 217.) Her psychosocial and environmental problems were determined to be severe due to a history of alcoholism, lack of social support and financial issues. (R. at 217.) Dr. Rizwan assessed Williams's Global Assessment of Functioning, ("GAF"), to be 50-

55.[9]  (R. at 217.)  Dr. Rizwan prescribed Effexor XR and advised Williams to continue therapy, group therapy and substance abuse treatment, and suggested that Williams return in two to three months, or earlier if necessary.  (R. at 216-17.)

The medical records from PCS dated May 21, 2004, to May 3, 2005, are mostly illegible.  (R. at 210-15.)  However, it appears that Williams reported an improvement in her anxiety and depression on May 21, 2004.  (R. at 215.)  Furthermore, the progress notes from May 21, 2004, indicated that Williams was within normal limits in her appearance, behavior, orientation, speech, mood, range of affect, thought process, thought center and perception.  (R. at 215.)  On May 21, 2004, Williams's diagnosis remained virtually unchanged, her condition was noted as improved and her Effexor XR dosage was increased.  (R. at 215.)  On September 13, 2004, Williams reported increased anxiety and her mood was noted as anxious.  (R. at 214.)  Williams was found to be within normal limits as to the remaining mental status aspects.  (R. at 214.)  There was no change in diagnosis and her condition also was reported as unchanged.  (R. at 214.)  Williams presented to PCS on October 25, 2004, and she indicated that she was less anxious and had not experienced panic attacks in three to four weeks.  (R. at 213.)  Williams indicated that her appetite was "okay" and that her sleep had decreased.  (R. at 213.)  Williams was observed to be within normal limits as to each mental status aspect.  (R. at 213.)  There was no change in diagnosis or

---

[9]The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness."  DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994).  A GAF of 41-50 indicates "serious symptoms . . . OR any serious impairment in social, occupational, or school function."  DSM-IV at 32.  A GAF of 51-60 indicates "moderate symptoms . . . OR moderate difficultly in social, occupational, or school functioning. . . ."  DSM-IV at 32.

-23-

condition. (R. at 213.)

Williams presented to PCS again on February 7, 2005, and complained of depression and anxiety. (R. at 212.) Her mental status was found to be mostly within normal limits, but her mood was found to be depressed. (R. at 212.) Once again, there was no change as to Williams's diagnosis or condition. (R. at 212.) On April 19, 2005, Williams reported worsening depression that she alleged had been occurring for the previous several months. (R. at 211.) Williams's appearance, behavior, orientation, thought process, thought center and perception were said to be within normal limits. (R. at 211.) However, her speech was slowed, her mood was depressed and her range of affect was blunted. (R. at 211.) There was no change in Williams's diagnosis, but her condition was found to have worsened. (R. at 211.) On May 3, 2005, Williams's mental status aspects were found to be within normal limits. (R. at 210.) At this visit, there was no change to her diagnosis or condition. (R. at 210.) The records from PCS indicated that Williams successfully abstained from alcohol during that time period. (R. at 210-18.) Lastly, Williams presented to PCS on December 13, 2005, and reported improvements in her depression and complained of low grade anxiety. (R. at 294.) Williams's mental status aspects were found to be within normal limits and her diagnosis and condition remained unchanged. (R. at 294.)

On May 18, 2005, Williams presented to the Franklin Memorial Hospital emergency department with complaints of back pain, bowel problems and a fever. (R. at 251.) Williams complained of chronic back pain, which she alleged had worsened, as well as problems with both diarrhea and constipation, which she

-24-

indicated had lasted for months. (R. at 253.) Williams explained that the chronic back pain was due to arthritis in her back. (R. at 253.) In addition, Williams reported intermittent chest pain and abdominal pain. (R. at 253.) Upon examination, mild tenderness in the L2 to L4 spinal area area caused pain and a straight leg raising test on the left side caused an increase in back pain. (R. at 253.) Mild tenderness was noted in the left lower quadrant of the abdominal region. (R. at 253.) Williams's examination was otherwise normal, with no acute distress or obvious discomfort reported. (R. at 253.) The differential diagnosis revealed arthritis in the back, a urinary tract problem, diverticulitis and possible pulmonary disease. (R. at 253.) An additional diagnosis revealed abdominal pain and spinal arthritis. (R. at 254.) Williams was prescribed magnesium citrate, sodium biphosphate, sodium phosphate, Flexeril and Lortab. (R. at 257-58.)

A two view chest x-ray also was performed at Franklin Memorial Hospital on May 18, 2005. (R. at 263.) The x-rays revealed an asymmetric 6 mm nodular within the right upper lung field, which possibly represented a pulmonary nodule, likely related to tobacco use. (R. at 263.) No other plain radiographic evidence of acute cardiopulmonary process was observed. (R. at 263.) An abdominal and pelvic computerized axial tomography, ("CT"), scan also was taken. (R. at 264-65.) The CT scan showed mild asymmetric stranding of the pericolonic fat of the descending colon. (R. at 264.) There was no contrast material within the descending colon, and the descending colon was found to be nondistended. (R. at 264.) However, a suggestion of some bowel wall thickening was noted. (R. at 264.) In addition, the CT scan revealed a long area of low density within the spinal canal possibly representing an intraspinal fatty tumor, such as a lipoma. (R. at 264.) Scarring or

-25-

atelectasis was observed in the right lower lobe of the lung and a degenerative change was noted involving the lumbar spine with evidence of degenerative disc disease. (R. at 264.) An electrocardiogram, ("ECG"), also was performed on this date, and the records appear to indicate that the ECG was abnormal. (R. at 269.)

E. Hugh Tenison, Ph.D., completed a PRTF on June 1, 2005.[10] (R. at 219-32.) Tenison found that Williams suffered from an anxiety-related panic disorder with agoraphobia and a substance abuse disorder. (R. at 219, 224, 227, 232.) In addition, he determined that Williams was mildly limited in her activities of daily living and maintaining social functioning. (R. at 229.) Tenison found that Williams was moderately limited in maintaining concentration, persistence or pace. (R. at 229.) Moreover, he determined that Williams had experienced no episodes of decompensation. (R. at 229.) Tenison concluded that Williams's limitations from her impairments did not prevent her from meeting the basic mental demands of competitive work on a sustained basis. (R. at 232.)

---

[10]This particular PRTF appears to have been completed by E. Hugh Tenison, Ph.D. However, it should be noted that his findings are virtually identical to the PRTF completed by R.J. Milan, Jr. In addition, the RFC Continuation page of Tenison's PRTF is a nearly verbatim copy of Milan's RFC Continuation page, which was included in his MRFC. The undersigned is uncertain as to whether Tenison's findings were simply an affirmation of Milan's previous findings, or if the findings were Tenison's independent findings. The undersigned will set forth the findings as if they were Tenison's independent findings.

Also, the date printed on the PRFT is May 31, 2005; however, Tenison has marked through that date, and, in his own handwriting, indicated the date was June 1, 2005. Thus, the undersigned will use the date as written by Tenison.

-26-

Tenison also completed a MRFC on June 1, 2005.[11] (R. at 233-34.) Tenison found that Williams was not significantly limited in certain understanding and memory areas, including the ability to remember locations and work-like procedures or to understand and remember very short and simple instructions. (R. at 233.) He did determine that Williams was moderately limited in the ability to understand and remember detailed instructions. (R. at 233.) Additionally, as to Williams's sustained concentration and persistence ability, Tenison found that Williams was not significantly limited in the following areas: the ability to carry out very short and simple instructions; the ability to maintain attention and concentration for extended periods; the ability to sustain an ordinary routine without supervision; the ability to make simple work-related decisions; and the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (R. at 233-34.) However, Tenison found Williams to be moderately limited in her ability to carry out detailed instructions, the ability to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances and in the ability to work in coordination with, or proximity to, others without being distracted by them. (R. at 233.) Tenison determined that Williams was not significantly limited in several areas of social interaction, including the ability to interact appropriately with the general public; the ability to accept instructions and respond appropriately to criticism from supervisors; the ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and

_____

[11]There is also a striking similarity between the MRFCs completed by Tenison and Milan. Because there is nothing within the record indicating that Tenison's findings were an affirmation of Milan's findings, the undersigned will set forth Tenison's MRFC findings as if they were his independent findings.

the ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness. (R. at 234.) Tenison found no evidence of a limitation in Williams's ability to ask simple questions or request assistance. (R. at 234.) As for Williams's adaptation ability, Tenison found that Williams was not significantly limited in her ability to respond appropriately to changes in the work setting; the ability to be aware of normal hazards and take appropriate precautions; the ability to travel in unfamiliar places or use public transportation; or the ability to set realistic goals or make plans independently of others. (R. at 234.)

Dr. Richard M. Surrusco, M.D., a state agency physician, completed a Physical Residual Functional Capacity Assessment, ("PRFC"), on February 11, 2005. (R. at 235-42.) Dr. Surrusco determined that Williams retained the ability to occasionally lift and/or carry items weighing up to 20 pounds and frequently lift and/or carry items weighing up to 10 pounds. (R. at 236.) In addition, he found that Williams was capable of sitting, standing and/or walking with normal breaks, for approximately six hours in a typical eight-hour workday. (R. at 236.) Dr. Surrusco also found that Williams was unlimited in her ability to push and/or pull. (R. at 236.) Dr. Surrusco noted no postural, manipulative, visual, communicative or environmental limitations. (R. at 238-40.) Furthermore, Dr. Surrusco noted that the findings of Dr. Stowe, as to Williams's limitations and restrictions, were significantly different from his findings. (R. at 242.) This assessment was affirmed by Dr. Donald R. Williams, M.D., another state agency physician, on June 2, 2005. (R. at 242.)

On February 16, 2006, Dr. Taylor completed a Medical Assessment Of Ability To Do Work-Related Activities (Physical) form. (R. at 273-74.) Dr. Taylor

-28-

determined that Williams's osteoarthritis limited her ability to lift, carry, stand, walk and sit. (R. at 273.) She found that Williams could lift and/or carry a maximum of 10 pounds occasionally and lift and/or carry a maximum of 10 pounds frequently. (R. at 273.) In addition, Dr. Taylor found that Williams was capable of standing/walking for approximately two hours in a typical eight-hour workday, and that she could stand/walk for approximately 30 minutes without interruption. (R. at 273.) Dr. Taylor determined that Williams could sitting for about three hours in an eight-hour workday, and that she could sit one to two hours without interruption. (R. at 273.) Dr. Taylor also determined that Williams could occasionally climb, stoop, kneel, balance and crouch, but that she could never crawl. (R. at 274.) Moreover, Dr. Taylor found that Williams was limited in her ability to reach, handle and push/pull, but that she was unlimited in her ability to feel, see, hear and speak. (R. at 274.) Dr. Taylor noted that Williams's grip affected the previously mentioned physical functions due to the arthritis in her hands. (R. at 274.) Dr. Taylor also noted that Williams was limited by certain environmental restrictions, such as heights, moving machinery, temperature extremes and vibration, but that she was not limited by chemicals, dust, noise, fumes and humidity. (R. at 274.)

The following medical records were received subsequent to the hearing and were considered by the Appeals Council.[12] Williams sought treatment from FCFC on February 13, 2006, and complained of nasal and chest congestion, constant constipation and mucus in her bowel movements. (R. at 319.) Williams also

---

[12]Since the Appeals Council considered this evidence in reaching its decision not to grant review, this court also should consider this evidence in determining whether substantial evidence supports the ALJ's findings. *See Wilkins v. Sec'y of Dept. of Health & Human Servs.*, 953 F.2d 93, 96 (4th Cir. 1991).

presented on February 23, 2006, for a follow-up regarding her nasal congestion and indicated that the congestion had improved. (R. at 317.) She also reported discomfort in her back and hands, and informed Dr. Taylor that naproxen helped her discomfort at times, but not consistently. (R. at 317.) An examination was otherwise normal, with the exception of minimal arthritic changes in Williams's hands. (R. at 317.) The assessment noted arthritis and Dr. Taylor elected to prescribe Ultram for pain control. (R. at 317.) Dr. Taylor encouraged Williams to walk daily to help with her arthritis and weight control. (R. at 317.) Also, Dr. Taylor advised Williams to stop smoking and to schedule a follow-up with PCS to treat her anxiety and depression. (R. at 317.) On September 19, 2006, Williams presented to FCFC and was treated by Dr. John R. Merten, M.D. (R. at 315-16.) Williams complained of sinus congestion, drainage and a cough, as well as increased sinus pressure, discomfort in her ears and occasional wheezing. (R. at 315.) Williams was diagnosed with sinusitis and prescribed Ketek and Duraphen DM. (R. at 315.) On October 19, 2006, Williams presented and requested that Dr. Taylor fill out disability papers. (R. at 313-14.) Williams noted no new complaints, but explained that her pain seemed have worsened in the bilateral hands and wrists, as well as her knees. (R. at 313.) She reported that the pain was worse in the mornings. (R. at 313.)

Dr. Taylor completed another Medical Assessment Of Ability To Do Work-Related Activities (Physical) form on October 19, 2006. (R. at 310-11.) Once again, Dr. Taylor determined that Williams's osteoarthritis limited her ability to lift/carry, stand/walk and sit. (R. at 310.) Dr. Taylor found that Williams could lift and/or carry items weighing up to a maximum of 10 pounds occasionally, and that she could lift and/or carry items up to a maximum of 10 pounds frequently. (R. at 310.) Dr. Taylor

also found that Williams was capable of standing and/or walking for approximately two hours in an eight-hour workday, and that she would stand and/or walk for 30 minutes without interruption. (R. at 310.) Additionally, Dr. Taylor determined that Williams could sit for about three hours in an eight-hour workday, and that she could sit for approximately one to two hours without interruption. (R. at 310.) Dr. Taylor noted that Williams could occasionally climb, stoop, kneel, balance and crouch, but that she could never crawl. (R. at 311.) She also determined that Williams was limited in her ability to reach, handle, feel and push/pull, with no limitations in her ability to see, hear and speak. (R. at 311.) Dr. Taylor found that Williams also was limited by certain environmental restrictions, such as heights, moving machinery, temperature extremes and vibrations, but that she was not limited by chemicals, dust, noise, fumes or humidity. (R. at 311.)

## III. Analysis

The Commissioner uses a five-step process in evaluating DIB and SSI claims. *See* 20 C.F.R. §§ 404.1520, 416.920 (2007); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether the claimant: 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. §§ 404.1520, 416.920 (2007). If the Commissioner finds conclusively that a claimant is or is not disabled at any point in the process, review does not proceed to the next step. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a) (2007).

Case 2:07-cv-00025-GMW-PMS   Document 20   Filed 04/08/08   Page 31 of 40   Pageid#: 94

Under this analysis, a claimant has the initial burden of showing that she is unable to return to her past relevant work because of her impairment. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. §§ 423(d)(2)(A), 1382c(a)(3)(A)-(B) (West 2003 & Supp. 2007); *see also McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

By decision dated June 27, 2006, the ALJ denied Williams's claims. (R. at 13-19.) The ALJ found that Williams met the disability insured status requirements of the Act for DIB purposes through December 31, 2006. (R. at 15.) The ALJ found that Williams had not engaged in substantial gainful activity at any time relevant to the decision. (R. at 15.) In addition, the ALJ found that Williams suffered from anxiety disorder and arthritis, which he considered severe impairments pursuant to 20 C.F.R. §§ 404.1520(c), 416.920(c). (R. at 15.) However, the ALJ determined that Williams did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 16.) After a review of the record, the ALJ found that Williams had the residual functional capacity to perform light work. (R. at 17.) The ALJ determined that Williams possessed the ability to sit for eight hours with normal breaks, stand for four hours and walk for two hours with normal breaks. (R. at 17.) Furthermore, the ALJ found that Williams was able to lift items weighing up to 10

-32-

pounds frequently and items weighing up to 50 pounds occasionally, and that she had the ability to occasionally stoop and crawl. (R. at 17.) The ALJ also found that Williams could understand and perform simple job instructions with one and two step tasks, and that she could maintain concentration and attention for extended periods of time. (R. at 17.) The ALJ found that Williams was capable of performing her past relevant work as a sewing machine operator, sales clerk and cashier, as those occupations did not requires performance of activities precluded by her residual functional capacity. (R. at 19.) Thus, the ALJ concluded that Williams was not under a disability as defined under the Act and was not entitled to benefits. (R. at 19.) *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (2007).

Williams argues that the ALJ's decision was not supported by substantial evidence. (Plaintiff's Brief in Support of Motion for Summary Judgment, ("Plaintiff's Brief"), at 7-14.) Specifically, Williams argues that the ALJ erred by failing to accord proper weight to the medical opinion of a treating physician. (Plaintiff's Brief at 8-12.) In addition, Williams argues that the ALJ's residual functional capacity finding was not supported by substantial evidence within the record. (Plaintiff's Brief at 12-14.)

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. The court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided his decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether

-33-

the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays*, 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, see *King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. §§ 404.1527(d), 416.927(d), if he sufficiently explains his rationale and if the record supports his findings.

Williams's first argument is that the ALJ erred by not giving proper weight to the medical opinion of Dr. Taylor, a treating physician. (Plaintiff's Brief at 8-12.) In particular, Williams argues that the ALJ entirely rejected Dr. Taylor's findings and accorded greater weight to the medical opinion of Dr. Stowe, who performed only a consultative examination at the request of the Commissioner. (Plaintiff's Brief at 11.) I disagree.

In general, the ALJ must consider objective medical facts and the opinions and diagnoses of both treating and examining medical professionals, which constitute a major part of the proof of disability cases. *See McLain*, 715 F.2d at 869. The ALJ must generally give more weight to the opinion of a treating physician because that

Case 2:07-cv-00025-GMW-PMS   Document 20   Filed 04/08/08   Page 34 of 40   PageID#: 97

physician is often most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. *See* 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2007). However, "circuit precedent does not require that a treating physician's testimony 'be given controlling weight.'" *Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996) (quoting *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992 (per curiam)).[13] In fact, "if a physician's opinion is not supported by the clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." *Craig*, 76 F.3d at 590.

In the case at hand, Dr. Taylor, Williams's treating physician, determined that Williams's osteoarthritis limited her ability to lift, carry, stand, walk and sit. (R. at 273, 310.) Specifically, she found that Williams could lift and/or carry a maximum of 10 pounds, stand and/or walk for two hours in a typical eight-hour workday, stand and/or walk for 30 minutes without interruption, sit for about three hours in an eight-hour day and sit for approximately one to two hours without interruption. (R. at 273, 310.) Moreover, Dr. Taylor found that Williams could only occasionally climb, stoop, kneel, balance and crouch, and that she could never crawl. (R. at 274, 311.) Dr. Taylor also placed limitations on Williams's ability to reach, handle, feel and push/pull, but noted no limitations as to the ability to see, hear and speak. (R. at 311.)

---

[13]*Hunter* was superseded by 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2), which states, in relevant part, as follows:

> If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, we will give it controlling weight.

20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2007).

Case 2:07-cv-00025-GMW-PMS   Document 20   Filed 04/08/08   Page 35 of 40   PageID#: 98

Lastly, Dr. Taylor identified certain environmental limitations, such as heights, moving machinery, temperature extremes and vibrations, but placed no limitations on Williams's exposure to chemicals, dust, noise, fumes or humidity. (R. at 274, 311.)

Conversely, Dr. Stowe, who conducted a consultative examination, reported a fairly unremarkable examination of Williams and her conditions. (R. 177-85.) Dr. Stowe observed mild tenderness over the metacarpophalangeal and proximal interphalengeal joints of both hands and diagnosed her with osteoarthritis, tobacco abuse, hypertension and depression. (R. at 179.) However, the x-rays included in the medical records, and apparently reviewed by Dr. Stowe, merely demonstrated the following: degenerative changes at the first carpometacarpal joint, with no evidence of fracture or dislocation; unremarkable surrounding soft tissues with minimal scoliotic change; degenerative facet disease at L4-5 and L5-S1, with no evidence of spondylolysis or spondylolisthesis; and no other negative findings. (R. at 182-84.) Upon examination, Dr. Stowe reported normal findings, including a joint examination which revealed no effusions, episodes of infection, particular swelling or heat. (R. at 178.) Additionally, he found no redness or thickening of the joints and a normal range of motion in all areas. (R. at 180-81.) A spinal examination showed no kyphosis or scoliosis and the straight leg test was negative. (R. at 178.)

Based upon the above-mentioned findings, Dr. Stowe determined that, with normal breaks, Williams could sit for eight hours, stand for four hours and walk for two hours. (R. at 179.) Dr. Stowe also noted that Williams did not require the use of any assistive devices and that she was capable of lifting and/or carrying items weighing up to 10 pounds frequently and items weighing up to 50 pounds

-36-

occasionally. (R. at 179.) Furthermore, Dr. Stowe determined that Williams could bend frequently, occasionally stoop and crouch and that she was unlimited in her ability to reach, handle, feel, grasp and finger. (R. at 179.) Dr. Stowe reported no visual, communicative, workplace or environmental limitations. (R. at 179.) As such, he concluded that Williams did not suffer from debilitating arthritis. (R. at 179.)

The medical records show that both state agency psychologists placed no more than moderate limitations on Williams's mental capabilities, and noted that Williams was not significantly limited in most areas considered. (R. at 186-99, 219-34.) Both state agency psychologists concluded that Williams's limitations did not prevent her from meeting the basic mental demands of competitive work on a sustained basis. (R. at 188, 232.) Dr. Surrusco, a state agency physician, found that Williams retained the ability to frequently lift and/or carry items weighing up to 10 pounds and occasionally lift and/or carry items weighing up to 20 pounds. (R. at 236.) He also determined that Williams could sit and stand and/or walk, with normal breaks, for about six hours in a typical eight-hour workday. (R. at 236.) Although Dr. Surrusco noted no further limitations, he did acknowledge that Dr. Stowe's findings were significantly different from his findings as to Williams's limitations. (R. at 242.)

Upon a review of the record, the undersigned notes that the record is devoid of any other findings that are consistent with those of Dr. Taylor, the treating physician. No other records demonstrate restrictions or limitations as serious as those set forth by Dr. Taylor. The court recognizes that a treating physician's opinion is entitled to great weight; however, when, as in this case, the treating physician's opinion is

Case 2:07-cv-00025-GMW-PMS   Document 20   Filed 04/08/08   Page 37 of 40   PageId#: 100

inconsistent with other substantial evidence, it should be accorded significantly less weight. *See Craig*, 76 F.3d at 590. Therefore, the court is of the opinion that the ALJ did not err in according greater weight to a non-treating physician.

Williams also argues that the ALJ's residual functional capacity determination is not supported by substantial evidence within the record. (Plaintiff's Brief 12-14.) Williams points out that the ALJ found that she was capable of performing the full range of unskilled light work. (Plaintiff's Brief at 12), (R. at 19.) Based upon the meaning of light work, as defined under the regulations, Williams argues that the evidence of record indicates that she suffers from impairments that would prevent her from performing a full range of unskilled light work. (Plaintiff's Brief at 12-13.) Upon review of the ALJ's findings, as well as the relevant medical records and the testimony of the vocational expert, I disagree.

As noted on brief, the ALJ determined that Williams retained the residual functional capacity to perform light work. (R. at 19.) In particular, the ALJ specifically stated that Williams was capable of performing "the full range of unskilled light exertional work." (R. at 19.) Moreover, the ALJ concluded that Williams was capable of performing some of her past relevant work, including that of a sewing machine operator, a sales clerk and a cashier. (R. at 19.) At the hearing, the vocational expert identified Williams's past work as a sewing machine operator and sales clerk as light, semiskilled work, and her work as a cashier as light, unskilled work. (R. at 346.) Williams essentially contends that because the ALJ's residual functional capacity finding limited her to the full range of light, unskilled work, she was thus precluded from performing her past work as a sewing machine operator and

-38-

sales clerk, due to the fact that those jobs were classified as light, semiskilled work. Williams argues that, due to this apparent inconsistency, substantial evidence does not support the ALJ's findings. However, it should be noted that the ALJ clearly found that Williams was capable of performing her past relevant work as a cashier, which was identified by the vocational expert as light, unskilled work. (R. at 346.) Based upon this evidence, as well as the state agency assessments and the medical findings of Dr. Stowe, the court is of the opinion that there is substantial evidence within the record to demonstrate that Williams retains the ability to perform her past relevant work as a cashier, a job that requires an exertional level and capabilities consistent with the ALJ's residual functional capacity determination. In reliance upon medical evidence consistent with his residual functional capacity finding and the testimony from the vocational expert, the ALJ correctly identified Williams's past relevant work as a cashier as an occupation not precluded by his residual functional capacity determination. Therefore, based upon substantial evidence within the record, the undersigned is of the opinion that the ALJ's residual functional capacity finding was proper.

## IV. Conclusion

For the foregoing reasons, I will sustain the Commissioner's motion for summary judgment and overrule Williams's motion for summary judgment. The Commissioner's decision denying benefits will be affirmed.

An appropriate order will be entered.

DATED:     This _8th_ day of April, 2008.

THE HONORABLE GLEN M. WILLIAMS
SENIOR UNITED STATES DISTRICT JUDGE